FASA CORPORATION and Virtual
World Entertainment,
Plaintiffs,

v.

PLAYMATES TOYS, INC., Defendant.

No. 93 C 2445.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 5, 1994.

---

Karen Beth Ksander, Liza Marie Franklin, Sonnenschein, Nath & Rosenthal, Chicago, IL, for plaintiffs.

Paul R. Garcia, Kirkland & Ellis, Mark Van Buren Partridge, David C. Hillard, Marianne E. Ryan, Pattishall, McAuliffe, Newbury, Hillard & Geraldson, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiffs FASA Corporation ("FASA") and Virtual World Entertainment ("VWE")[1] sue defendant Playmates Toys, Inc. ("Playmates") alleging federal and common-law unfair competition (Counts I and II, respectively), copyright infringement (Counts III and IV), trademark infringement (Counts V and VI), dilution under Illinois' anti-dilution statute, 765 ILCS 1035/15 (Counts VII and VIII), and tortious interference with prospective business advantage (Count IX). Pursuant to Rule 56, Playmates moves for summary judgment on all counts.[2]

## BACKGROUND

The following undisputed facts are gleaned from the parties' respective Local Rule 12(M) statements of material facts and accompanying exhibits.[3]

1. For ease of exposition, unless the context requires otherwise, this opinion will refer to FASA and VWE collectively as "FASA."

2. This case was originally assigned to Judge Duff's calendar. It was reassigned to this court's calendar by Order of the Executive Committee dated May 25, 1994.

3. Local Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." Playmates' statement shall be cited herein as "Def.'s Facts ¶___." Similarly, Local Rule 12(N)(3)(a) requires the nonmoving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. FASA's response shall be cited as "Pls.' Facts ¶___." The nonmoving party may also submit a statement of "additional facts that require the denial of summary judgement," (cited herein as "Pls.' Add'l Facts ¶___"), with respect to which the movant, in turn, may respond (cited herein as "Def.'s Resp. ¶___"). All material facts set forth in either party's statement are deemed admitted unless controverted by the statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); see also Flaherty v. Gas Research Inst., 31 F.3d 451, 453 (7th Cir.1994); Waldridge v. American Hoechst Corp., 24 F.3d 918, 921–22 (7th Cir. 1994).

4. It appears from the record that FASA owns at least sixteen copyright registrations related to

FASA is the creator, developer, and distributor of various fictional universes, including BATTLETECH, which form the basis for board games, role-playing games, novels, and various game supplements. FASA also licenses the intellectual property and proprietary rights in its fictional universes to third parties for the development of interactive entertainment games, models, miniatures, merchandise, toys and other items.[4] Pls.' Objs. & Resps. to Def.'s Reqs. for Admis. [hereinafter Pls.' Admis.] ¶ 1. VWE is a virtual reality entertainment company formed by the creators of BATTLETECH to create and develop virtual reality games simulating adventures in the BATTLETECH universe. Pls.' Facts ¶ 2. Playmates is a marketer of toys including a line of six toys featuring characters and vehicles found in the EXOSQUAD animated cartoon series.[5] Id. ¶¶ 6, 7, 9. The present lawsuit centers on

BATTLETECH works. The effective date of the majority of these registrations postdate the filing of this lawsuit on April 22, 1993; however, all of the works were first published prior to the suit. The following five works are protected under copyright registrations predating the filing of this lawsuit and effective March 4, 1993: "BattleTech The Return of Kerensky The Clans are Coming" (poster); "BattleTech Technical Readout: 3050"; "The BattleTech Compendium"; "MechWarrior The BattleTech Role Playing Game (Second Edition)"; "Battletech Wolf Clan Sourcebook." Additionally, a copyright registration effective March 29, 1993 exists with respect to "Battle-Tech; A Game of Armored Combat Second Edition." FASA also owns copyright registrations on the following BATTLETECH-related works (effective date in parentheses): "BattleTech Technical Readout 3025" (August 11, 1993); "BattleTech Technical Readout 2750" (August 11, 1993); "BattleTech Technical Readout 3055" (August 13, 1993); "Mechwarrior: The Battle-Tech Role Playing Game" (August 13, 1993); "BattleTech Technical Readout 3026 (Vehicles and Personal Equipment)" (August 16, 1993); "BattleTech Manual: The Rules of Warfare" (August 17, 1993); "CityTech: The BattleTech Game of Urban Combat" (November 26, 1993); "BattleTech Solaris VII: The Game World" (November 26, 1993); "BattleTroops: A Game of Urban Man-to-Man Combat in the BattleTech Universe" (November 26, 1993); "BattleForce: Small Unit Actions in the 31st Century" (January 13, 1994).

5. An EXOSQUAD animated television series premiered on national television in September 1993. Segal Decl. ¶ 5.

Playmates' alleged infringement of FASA's intellectual property and proprietary rights in BATTLETECH by designing and marketing the EXOSQUAD toy line.

BATTLETECH—created by FASA in 1984 and originally sold as a role-playing game—is a fictional universe set in the 31st century. The BATTLETECH universe is comprised of empires such as the Star League, an empire consisting of five cosmic houses each of which encompasses hundreds of interstellar worlds. Each house seeks control of the galaxy. The battles between worlds are dominated by BattleMechs (also called Mechs), massive man-shaped, robot-like tanks of various shapes and designs [6] which are piloted by human soldiers called MechWarriors. Pls.' Admis. ¶ 2.[7] Among the MechWarriors' adversaries are the Clan Elementals, "men and women bred to be foot soldiers." FASA Corp., BATTLETECH

THE RETURN OF KERENSKY TECHNICAL READOUT: 3050 (1990) at 8.

The EXOSQUAD story line is set in the 22nd Century and involves confrontations between the conquering, genetically engineered, Neosapien race and an enslaved human race living on Earth, Venus and Mars. The Neosapiens and humans battle each other, encased in large robotic fighting machines known as "Exo–Frames" or "E–Frames." [8] Segal Decl. ¶ 5. Playmates markets a toy line—consisting of six toys—featuring characters and vehicles from the EXOSQUAD cartoon series.[9] Pls.' Facts ¶¶ 7, 9.

In late 1991, FASA entered into an agreement with Robert Allen whereby Allen would present the BATTLETECH concept, story, and models, on behalf of FASA to a number of toy companies in order to find a company to manufacture a BATTLETECH toy line.[10]

6. FASA licensed the designs for the original twenty BattleMechs. FASA states that it subsequently began to develop its own unique designs and now markets products containing more than 160 original BattleMechs. Pls.' Add'l Facts ¶ 5. Playmates denies that FASA's BattleMech designs are unique or original. Def.'s Resp. ¶ 5.

7. *MECHWARRIOR The BattleTech Role Playing Game* (2d ed.) introduces the BATTLETECH universe and BATTLEMECHs as follows:

By the 31st century, humanity has spread to thousands of worlds, while a handful of powerful empires wage continual war for the right to use the stars. Foremost among the weapons used in that struggle are BattleMechs. Loaded with autocannons, missile launchers, lasers, and charged-particle beam weapons, these fusion-powered war machines of articulated armor stand upward of ten meters high. Piloting them are MechWarriors, the best, most intensively trained men and women available. Like the armored knights of an earlier age, MechWarriors are popular heroes, and their exploits are the stuff of legends.
FASA Corp., MECHWARRIOR THE BATTLETECH ROLE PLAYING GAME (2d ed. 1991) at 5. *See also* FASA Corp., THE BATTLETECH COMPENDIUM (1990) at 7, 11 ("BattleMechs—the most powerful war machines ever built—dominate the battlefields of the 31st century. These huge, man-shaped vehicles are faster, more maneuverable, better-armored, and more heavily armed than any other combat unit. Equipped with particle projector cannons, lasers, rapid-fire autocannons and missiles, these behemoths pack enough firepower to flatten everything but another 'Mech." "The human soldiers who pilot BattleMechs are called MechWarriors."

8. Playmates' 1993 Catalog sets out the EXOSQUAD story line as follows:

Its the 22nd Century. Humans have settled the Homeworlds of Earth, Mars and Venus. Exotechnology links man and modern machines in powerfully advanced ways. But civilization's greatest achievement, a genetically engineered perfect race of Neosapiens, led by the ruthless Phoeton, have turned on their creators. Mankind is brutally conquered and enslaved. In the ultimate confrontation for survival, only Mace Corbitt and the EXOSQUAD stand in the way of the Neosapien's permanent subjugation of the human race.
Partridge Decl., Ex. 25.

9. Playmates' 1993 catalog featured eleven E–Frames: Command E–Frame (with Phaeton action figure); Stealth E–Frame (with Typhon action figure); Amphibious Assault E–Frame (with Shiva action figure); Communications Intelligence E–Frame (with DeLeon action figure); Aerial Attack E–Frame (with Mace Corbitt action figure); Rapid Assault E–Frame (with Marsala action figure); Ground Assault E–Frame (with Draconis action figure); Police Enforcer E–Frame (with Napier action figure); Troop Transport E–Frame (with Livanius action figure); Field Repair E–Frame (with Maggie action figure); and, the EXOSQUAD Heavy Attack E–Frame. *See* Partridge Decl., Ex. 25. Ultimately, only the first six of these toys were actually manufactured—in some instances with changes in the names of the E–Frame or accompanying action figure. *See id.* Exs. 1–6.

10. Although, FASA maintains that Allen and FASA never reached agreement on the nature

Allen Dep. at 14–15, 150. On December 10 or 11, 1991, Allen met with Chris Devine Dailey, an employee of Playmates, and presented three potential toy lines, including BATTLETECH. Pls.' Facts ¶ 10. Playmates had been looking for a futuristic robot-related toy line for several months prior to Allen's presentation and had previously reviewed a variety of robot-related materials. Def.'s Resp. ¶ 12. Playmates had also been engaged in discussions with Universal Cartoon Studios—prior to Allen's presentation—regarding the development of a "hard-edged" robot line. *Id.*

At the outset of the meeting with Allen, Dailey required him to sign an untitled document on Playmates' letterhead which provides as follows:

> It is the policy of Playmates Toys, Inc. not to review or consider any unsolicited proposals of any kind.

> You have advised us that you have an "idea" which you believe may be of interest to us.

> We are prepared to consider your idea only upon the following terms:

> 1. You will expressly waive any and all claims of any kind whatsoever, past, present or future, known or unknown against Playmates Toys, Inc. in any way relating to or connected to the "idea".

> 2. In consideration for such waiver, Playmates Toys, Inc., will review your "idea" in written form. We will return all materials submitted in connection therewith within two weeks after submission.

and scope of Allen's role, FASA acknowledges that it did permit Allen to make several presentations—including the presentation of BATTLETECH to Playmates. Pls.' Add'l Facts ¶ 10. Furthermore, FASA admits that Allen was acting as FASA's representative when he met with Playmates. Pls.' Admis. ¶ 38.

11. Allen testified that he did not read the document but he presumed that it was a confidentiality agreement relating to the disclosure/nondisclosure of ideas presented at the meeting. Allen Dep. at 137–39. Allen further testified that he "had no authorization to be signing any documents with relation to anything that dealt with BATTLETECH." *Id.* at 135.

The disclosed matter relates to: [handwritten] (1) "BATTLETECH" (2) "WENDY & HER WAGON" (3) "SPEEDBALLS"

Partridge Decl., Ex. 37.[11] After signing the document, Allen introduced four BATTLETECH toy prototypes[12] and provided various BATTLETECH materials for Playmates' subsequent review. Def.'s Resp. ¶¶ 14, 15. Although the record is less than clear with respect to what materials Allen left with Playmates, it appears that Allen left the following: a press kit containing information on BATTLETECH centers; a poster displaying various miniature BattleMech gaming pieces; a FASA catalogue which displays all of FASA's products; and, a BATTLETECH center operations manual. Allen Dep. at 68, 70, 80, 82; Def.'s Resp. ¶ 15. Dailey told Allen that Playmates would not inform him of any decisions regarding the BATTLETECH toy line until after the February 1992 Toy Fair. Allen Dep. at 59.

In March 1992, Allen received several requests from Playmates for additional BATTLETECH product—including two calls (on or about March 3 and March 7) from Karl Aaronian, Playmates' Director of Marketing and one call (on or about March 30) from Richard Sallis, Playmates' President. *Id.* at 92–99. In response, Allen provided Playmates with a promotional videotape; the *BATTLETECH Technical Readout 2750*—a catalogue of "illustrations, statistics and other vital information about the BATTLEMECHS"; the *BATTLETECH Compendium*—a compilation of rules, "battle demonstrations ... [and] MECH construction"; and additional press material. *Id.* at 79;

12. FASA has provided the court with photocopies of photographs of the four BATTLETECH toy prototypes. Ksander Decl., Ex. 19. However, the court has had difficulty discerning the specific qualities and features of the prototypes with any particularity because the quality of the reproductions is so poor. One of the prototypes appears to resemble a large humanoid robot with a head, two legs and two arms; another prototype appears to be a space-shuttle-like structure mounted upon two legs. The other two prototypes are virtually undiscernible from the photocopies.

Ksander Decl., Ex. 23, Allen Letter to Sallis at 2; Pls.' Add'l Facts ¶ 21.

On May 27, 1992, Playmates' Marketing Director, Karl Aaronian informed Allen that Playmates was not interested in a BATTLE-TECH license. Def.'s Resp. ¶ 32; Allen Dep. at 116. On June 3, 1992, Aaronian returned the promotional videotape and certain other materials supplied by Allen; however, Playmates retained the BattleMech poster, the *BATTLETECH Compendium,* and the *BATTLETECH Technical Readout 2750* containing detailed Mech designs. Def.'s Resp. ¶ 33; Ksander Decl., Ex. 31, Aaronian Letter to Allen.

While it was still considering the BATTLETECH toy line, Playmates entered into a work-for hire agreement, dated April 7, 1992, with Russell Edmisson, a freelance designer, to prepare drawings and prototypes for Playmates. Edmisson's agreement was captioned "RE: Battle Tech." Ksander Decl., Ex. 27. Edmisson testified in his deposition that Aaronian told him that Playmates had a "very high priority project" involving the construction of "a large robot with tons of firepower ... he wanted the robot to be humanoid in the fact that it would have arms and legs and a head area." Edmisson Dep. at 27, 30. Edmisson also testified that Aaronian had shown him some material "torn out of magazines," *id.* at 26, 32, but Edmisson could not recall precisely what the material was. *Id.* Edmisson further testified that, working in conjunction with a model maker, he created two toy robot prototypes but he knew nothing about BATTLETECH (besides the name) at the time he constructed the prototypes and had never seen any books or materials bearing the BATTLETECH name. *Id.* at 63–64.

While it was considering licensing BATTLETECH, Playmates also instructed Frank Asano, a designer with the Japanese company Sente, to build a BATTLETECH prototype using the BATTLETECH MAD CAT design as a model for the styling of the prototype. Aaronian Dep. at 191; Def.'s Resp. ¶ 25. Aaronian testified that the prototype made by Sente "looked nothing like the BATTLETECH reference sent, and

nothing else was done with it." Aaronian Dep. at 108.

Meanwhile, in January 1992, Allen had presented BATTLETECH to Tyco Toys, Inc. ("Tyco"). Def.'s Resp. ¶ 16. Following Playmates' rejection of the opportunity to purchase a BATTLETECH license, FASA renewed its discussions with Tyco and began developing designs for a BATTLETECH toy line. Def.'s Resp. ¶ 34. FASA's Chairman and CEO, Morton Weisman, testified in his affidavit that FASA had planned on entering into a BATTLETECH licensing agreement with TYCO at the 1993 Toy Fair but that Tyco backed out after discovering that Playmates had introduced the EXOSQUAD toy line in its 1993 catalogue. Weisman Decl. ¶ 4. However, approximately two months later, in April 1993, Tyco and FASA entered into a letter of agreement on the terms for an exclusive worldwide master toy license for BATTLETECH. Second Partridge Decl. Ex. 49.

The core of FASA's complaint is that "the designs, images, descriptions characteristics and other elements of ExoSquad are substantially similar to the unique images, designs, descriptions, characteristics and other elements of the BATTLETECH universe." Pls.' Compl. ¶ 44. In particular, FASA alleges the following (which we quote at length solely to provide a flavor of the underlying dispute):

> The ExoSquad lives in a futuristic, interstellar, battle dominated environment significantly resembling the futuristic, interstellar, battle dominated BATTLETECH universe designed ... by FASA and VWE.
>
> The ExoSquad fights the Neosapiens, a genetically bred race seeking to conquer mankind, just as the BATTLETECH MECHWARRIORS fight the Clan Elementals, products of a genetically manipulated human race.
>
> ExoSquad fights the Neosapiens in massive, robot-like war machines called Exo-Frames or E–Frames, which are substantially similar in design, image, description, characteristics and other elements to the unique BATTLEMECHS and Omni Mechs designed ... by FASA and VWE.

... The ExoSquad operates their E-Frames through computer and weapons systems that communicate directly with the pilot's brain, just as each MECHWARRIOR operates his BATTLEMECH through a neural helmet which communicates directly with the pilot's brain.

ExoSquad even directly copied specific names created, developed, published, promoted and popularized by BATTLETECH. The name of the ExoSquad Neosapien warrior "Draconis" is a well known and widely used name for one of the five interstellar Houses in the BATTLETECH universe.

*Id.* In addition to alleging copyright (Counts III and IV) and trademark (Counts V and VI) infringement, FASA seeks relief under theories of statutory and common-law unfair competition (Counts I and II), dilution (Counts VII and VIII), and tortious interference with prospective business advantage (Count IX). Pursuant to Rule 56, Playmates moves for summary judgment on all counts.

### *Summary Judgment Standard*

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513. In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2514.

The Seventh Circuit has recently summarized the respective burdens on the moving and nonmoving parties on a motion for summary judgment as follows:

The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).... Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Id.* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

*Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992).

### Allen's Alleged Waiver

■ At the outset, Playmates argues that all of FASA's claims are barred by virtue of the waiver signed by Allen. The first question this court must address with respect to the issue of whether FASA is bound by Allen's purported waiver, is what law governs this agency issue. A federal court sitting in Illinois, exercising diversity jurisdiction, must apply the substantive law of Illinois, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), including Illinois' choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

■ Playmates contends that Illinois law governs. FASA contends that California law governs. To the limited extent that they briefed the choice-of-law issue, both Playmates and FASA appear to have analyzed the issue implicitly characterizing the subject matter underlying the analysis as that of contract. For instance, FASA asserts that California law is "the proper authority" and cites to two cases, *Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 14 Cal. App.4th 637, 645, 17 Cal.Rptr.2d 713, 718 (1993), and *Gruen Watch Co. v. Artists Alliance*, 191 F.2d 700, 703 (9th Cir.1951), both of which involved determining the proper law

to apply in construing certain contracts.[13] Similarly, in arguing that Illinois' law governs, Playmates prominently cites section 188 of the *Restatement (Second) of Conflict of Laws* [hereinafter *Restatement (Second)* ]—which sets forth rules for determining the governing law with respect to an issue in contract wherein the parties have failed to make an effective choice of law—as well as three cases, *Florida Risk Planning Consultants, Inc. v. Transport Life Ins. Co.*, 732 F.2d 593, 595 (7th Cir.1984), *Champagnie v. W.E. O'Neil Constr. Co.*, 77 Ill.App.3d 136, 144–46, 32 Ill.Dec. 609, 395 N.E.2d 990 (1979), and *Illinois Tool Works v. Sierracin Corp.*, 134 Ill.App.3d 63, 89 Ill.Dec. 40, 479 N.E.2d 1046 (1985), all of which support the proposition that Illinois applies the *Restatement (Second)* 's most significant relationship analysis to contract issues. However, as noted above, the issue at bar presents, in the first instance, a question of agency law—whether a principal will be bound by the act of its agent—not contract law.[14] In fact, it is clear that both of the parties recognize that an agency question is presented because their substantive arguments as to whether FASA should be bound rely on agency principles. Accordingly, we must determine what law Illinois courts would apply in resolving this issue of agency law.

There is no established Illinois rule governing choice of law in the agency context; in particular, there appears to be no Illinois decisions addressing what law applies to a claim of agency or apparent authority where the alleged principal, agent, and third parties are located in different states.[15] Indeed, as Scoles and Hay have observed, "the case law

13. FASA's authorities are particularly misplaced in the instant case because they involved application of California's choice-of-law rules, not Illinois'. *See, e.g., Stonewall Surplus Lines*, 14 Cal. App. 4th at 637 n. 4, 17 Cal.Rptr.2d at 718 n. 4 ("The parties do not dispute this case is governed by California's choice of law rules.").

14. However, it is certainly true that there is a contract issue lurking in this case—namely, the validity of the purported waiver signed by Allen. Because neither party has raised the issue of whether a waiver of claims not yet in existence—and about which the waiving party could have no knowledge—is void as against public policy, *see, e.g., Fair v. International Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1115 (7th Cir.1990) (noting

that the argument "that courts should not recognize general releases of claims not known or contemplated by the parties at the time of the release [ ... ] has a firm basis in law"), and because we find that a genuine issue of material fact exists as to whether FASA is bound by Allen's waiver, we need not address this question of contract law at this time. We note, however, that a second and distinct choice of law analysis must be conducted to determine that question.

15. FASA is an Illinois Corporation with its principal place of business in Chicago, Illinois. Allen is a resident of Cincinnati, Ohio. Playmates is a California corporation with its principal place of business in La Mirada, California.

[in this area] is scant." EUGENE F. SCOLES & PETER HAY, CONFLICT OF LAWS § 18.34 (2d ed. 1992). In the absence of any clear Illinois authority on the issue, the court's task is to predict how the Supreme Court of Illinois would decide the issue. *See Rose v. Franchetti*, 979 F.2d 81, 85 (7th Cir.1992). Decisions of the Illinois appellate courts are ordinarily given great weight in this enterprise, *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern Nat'l Ins. Grp.*, 750 F.2d 619, 624 (7th Cir.1984), and should be followed "unless we have solid reason to believe that the state's highest court would repudiate them." *Rose*, 979 F.2d at 85. In *Florida Risk Planning Consultants, Inc. v. Transport Life Ins. Co.*, 732 F.2d 593 (7th Cir. 1984), the Seventh Circuit determined that "Illinois courts have adopted the rules of the *Restatement (Second) of Conflicts (1971),*" and proceeded to apply the *Restatement (Second)*'s "most significant relationship" test to determine the applicable law in a contract dispute. *Id.* at 595; *see also Palmer v. Beverly Enterprises*, 823 F.2d 1105, 1107 (7th Cir.1987) (following *Florida Risk Planning* and applying the most significant relationship test to a contract dispute). In addition to following the *Restatement (Second)*'s approach in contract cases, Illinois courts also have adopted the *Restatement (Second)* for determining the applicable law in tort cases. *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970). In view of Illinois' adoption of the *Restatement (Second)* in these two significant substantive areas, the court finds that the Supreme Court of Illinois would also adopt the *Restatement (Second)* for determining the applicable law in the agency context.

Section 292 of the *Restatement (Second)* provides:

Contractual Liability of Principal to Third Person

(1) Whether a principal is bound by action taken on his behalf by an agent in dealing with a third person is determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction under the principles stated in § 6.

(2) The principal will be held bound by the agent's action if he would so be held bound under the local law of the state where the agent dealt with the third person, provided at least that the principal had authorized the agent to act on his behalf in that state or had led the third person reasonably to believe that the agent had such authority.

RESTATEMENT (SECOND) OF CONFLICT OF LAW § 292 (1971).

In the present case, FASA admits that Allen, acting as a representative of FASA, presented BATTLETECH to Playmates. Pls.' Admis. ¶ 38; *see also* M. Weisman Decl. ¶ 3 (stating that although no agreement was reached regarding the exact nature and scope of Allen's role, FASA permitted Allen to present BATTLETECH to Playmates). Accordingly, because FASA authorized Allen to act on its behalf in presenting BATTLETECH to Playmates in California, the court finds that section 292(2) controls, and FASA will be bound by Allen's conduct if it would be so bound under the laws of California.

■ Contrary to Playmates' suggestion, the fact that FASA admits that Allen was acting as its representative, does not, standing alone, compel the conclusion that FASA is bound by Allen's act of signing a waiver. As noted in *Turner v. Citizens Nat. Bank*, 206 Cal.App.2d 193, 23 Cal.Rptr. 698, 704 (1962), "[a]n admission that a person is an agent does not adopt every act performed by him; the admission does not cover the extent of his authority." Under section 2330 of the California Civil Code, "[a]n agent represents his principal for all purposes within the scope of his actual or ostensible authority," CAL. CIV.CODE § 2330, and only those liabilities "which would accrue to the agent from transactions within [his actual or ostensible authority], if they had been entered into on his own account, accrue to the principal.[16] In-

---

16. Under the California Civil Code, "[a]n agent has such authority as the principal, actually or ostensibly, confers upon him." CAL CIVIL CODE § 2315. "Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." CAL.CIVIL CODE § 2316. "Ostensible authority is such as a

deed, in recognition of section 2330, Playmates correctly states that "FASA is bound by 'all the rights and liabilities which would accrue to the agent from transactions' within the limit of [Allen's] actual or ostensible authority." Def.'s Mem. at 13. Therefore, in order to determine whether FASA is bound by Allen's waiver, the court must determine whether Allen's signing of the waiver was within the scope of his actual or ostensible authority.

Both FASA and Allen expressly deny that Allen was actually authorized by FASA to sign Playmates' waiver, *see* Allen Dep. at 135; M. Weisman Decl. ¶ 4, and Playmates has submitted no evidence suggesting that Allen was actually authorized to waive claims on behalf of FASA. Accordingly, at the very least, a genuine issue of material fact exists as to whether Allen was so authorized.

Playmates argues, nevertheless that FASA should be bound by Allen's waiver because it is undisputed that Allen had actual authority to present BATTLETECH to Playmates, and by statute, "[a]n agent has authority: (1) [t]o do everything necessary or proper and usual in the ordinary course of business, for effecting the purpose of his agency." CAL. CIV.CODE § 2319. In light of section 2319, Playmates argues that because its "normal operating procedures" called for Allen to sign a waiver before he could make his presentation, the signing of the waiver was necessary for the performance of his authorized conduct. Thus, Playmates concludes, Allen's waiver was within the scope of his authority. This argument, while superficially clever, cannot withstand scrutiny. Although it may be *Playmates'* normal operating procedures to require a waiver before considering solicitations, this does not necessarily make signing a waiver "necessary" for Allen's authorized conduct. Allen was authorized to present BATTLETECH to toy manufacturers; there is no evidence in the record to support the inference that toy manufacturers uniformly require such waivers or that such waivers are "necessary or proper and usual in the ordinary course of business." Based

upon the present record, the court cannot conclude that Playmates' unilateral requirements define the range of conduct that is "necessary" for effecting the purpose of Allen's agency. At the very least, a genuine issue of material fact exists as to whether Allen's signing of the waiver fell within the scope of his actual authority.

■■■ Absent actual authority, FASA will be bound by Allen's waiver only if Allen acted within the scope of his ostensible authority in signing the waiver. Ostensible authority, under California law, "arises as a result of conduct of the principal which causes the third party reasonably to believe that the agent possesses the authority to act on the principal's behalf." *Unites States Credit Bureau, Inc. v. Cheney,* 235 Cal. App.2d 357, 360, 45 Cal.Rptr. 525, 527 (1965). Ostensible authority is predicated on the doctrine of estoppel: If a principal, by its acts, leads another to believe that it has conferred authority upon an agent, it will be estopped from asserting—as against the person who has justifiably relied on the principal's acts—that it did not intend to confer such authority. *Yanchor v. Kagan,* 22 Cal.App.3d 544, 549, 99 Cal.Rptr. 367, 370 (1971). Thus, ostensible authority is predicated on the acts or declarations of the principal *vis-a-vis* the third party. *Dill v. Berquist Constr. Co.,* 24 Cal.App.4th 1426, 1438, 29 Cal.Rptr.2d 746, 752 (1994); *People v. Torres,* 136 Cal.App.3d 556, 562, 186 Cal.Rptr. 385, 389 (1982). The essential elements of ostensible authority are: (1) an act or representation by the principal; (2) justifiable reliance by a third party; and (3) change of position or injury resulting from such reliance. *Yanchor,* 22 Cal.App.3d at 549, 99 Cal.Rptr. at 370 (1971).

Playmates has submitted no evidence establishing that FASA engaged in any conduct or made any representation *vis-a-vis* Playmates upon which Playmates could justifiably rely in believing that Allen was authorized to sign a waiver on FASA's behalf. Indeed, Playmates has submitted no evidence indicating that FASA ever had any communications or contact with Playmates whatsoever—re-

principal, intentionally or by want of ordinary care, causes ... a third person to believe the

agent to possess." CAL.CIVIL CODE § 2317.

garding Allen or otherwise. Playmates' claim of ostensible authority rests on little more than the fact that Allen was acting as FASA's representative. However, the mere existence of an agency relationship does not establish ostensible authority. *Cf. Turner,* 206 Cal.App.2d 193, 23 Cal.Rptr. at 704. Accordingly, on the present record, the court cannot conclude that FASA engaged in any conduct that would lead Playmates reasonably to believe that Allen, a sales representative, had ostensible authority to waive any claims on FASA's behalf. In view of this determination, the court need not consider whether any alleged reliance by Playmates was justified.

■ Because Playmates fails to establish that no genuine issue exists as to whether Allen acted within the scope of his actual or ostensible authority when he signed Playmates' waiver, Playmates is not entitled to summary judgment in its favor on the grounds of waiver.[17]

**FASA's Copyright Claims (Counts III and IV)**

FASA's copyright claims are predicated on two principal allegations: First, that the EXOSQUAD Heavy Attack E–Frame is a direct copy of the MAD CAT—a BATTLETECH OmniMech. Compl. ¶ 68. Second, "[t]he to-

tal concept, look and feel of the designs, images, descriptions, characteristics and other elements of Exosquad is [sic] substantially similar to the unique copyrighted designs, images, descriptions, characteristics and other elements of the BATTLETECH universe." *Id.* ¶ 78. In providing substance to the latter allegation, FASA has stated as follows:

(1) The ExoSquad lives in a futuristic, interstellar, battle dominated environment significantly resembling the futuristic, interstellar, battle dominated BATTLETECH universe ...;

(2) The ExoSquad fights the Neosapiens, a genetically bred race seeking to conquer mankind, just as the BATTLE-TECH MECHWARRIORS fight the Clan Elementals, products of a genetically manipulated human race seeking to conquer mankind;

(3) ExoSquad battles the Neosapiens in massive, robot-like war machines called ExoFrames or E–Frames, which are substantially similar in design, image, description, characteristics and other elements to the BATTLEMECHS and OmniMechs designed ... by Plaintiffs;

(4) The ExoSquad operates their E–Frames through computer and weapons systems that communicate directly

---

17. Had the court determined the agency issue under Illinois law, the same outcome would have resulted, as the agency law of Illinois and California are not materially different. Under Illinois law a principal may be bound by its agent's actions where the agent has either actual or apparent authority. *State Security Ins. Co. v. Burgos,* 145 Ill.2d 423, 431–32, 164 Ill.Dec. 631, 635, 583 N.E.2d 547, 551 (1991); *Advance Mortgage Co. v. Concordia Mut. Life Ins. Ass'n,* 135 Ill.App.3d 477, 481, 90 Ill.Dec. 225, 229, 481 N.E.2d 1025, 1029 (1985). The scope of the agent's authority extends to those acts " 'reasonably necessary' " to the performance of the agent's authorized activity. *Advance Mortgage,* 135 Ill.App.3d at 482, 90 Ill.Dec. at 229, 481 N.E.2d at 1029 (quoting 2A C.J.S. Agency § 154 (1972)). As discussed in the text, the court finds that, at the very least, a genuine issue exists as to whether Allen was actually authorized to sign a waiver of claims on FASA's behalf. Additionally, we find that a genuine issue of material fact exists as to whether Allen's signing of Playmates' waiver was "reasonably necessary" to his authorized conduct of presenting BATTLETECH to toy manufacturers. Also, Playmates would not be

entitled to summary judgment under Illinois' doctrine of "apparent authority"—which parallels California's "ostensible authority" law in all material respects. Under Illinois law—as was the case with respect to California—apparent authority is predicated on the principal's conduct. *State Security,* 145 Ill.2d at 431, 164 Ill. Dec. at 635, 583 N.E.2d at 551 ("Apparent authority arises where a principal creates, through words or conduct, the reasonable impression that the putative agent has been granted authority to perform certain acts."); *Lang v. Consumers Ins. Serv., Inc.,* 222 Ill.App.3d 226, 232, 164 Ill.Dec. 825, 830, 583 N.E.2d 1147, 1152 (1991) ("The authority ... must be traced to some word or act of the alleged principal, not the acts or words of the agent."). The record contains no evidence of any conduct by FASA justifying Playmates' impression that FASA authorized Allen to waive claims on its behalf. Nor does the record contain any evidence of any prior course of dealing between FASA and Allen that would justify a third party's impression that Allen was so authorized. Accordingly, Playmates would not be entitled to summary judgment on the agency issue even under Illinois law.

with the pilot's brain, just as each ME-CHWARRIOR operates his BATTLE-MECH through a neural helmet which communicates directly with the pilot's brain[.]

Ksander Decl., Ex. 48, Pls.' Supplemental Objs. & Resps. to Def.'s Set of Interrogs. ¶ 13. In addition to the foregoing claims, FASA also contends that the eleven EXOS-QUAD E-Frame toy designs displayed in Playmates' 1993 catalog are substantially similar to the total look and feel of various BATTLETECH Mechs and OmniMechs.[18]

 To prevail on its copyright infringement claims, FASA must prove both "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir.1994) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991)); *see also Atari, Inc. v. North Am. Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). In the absence of direct evidence, "copying may be inferred where the defendant had access

to the copyrighted work and the accused work is substantially similar to the copyrighted work." *Atari*, 672 F.2d at 614; *Wildlife Express*, 18 F.3d at 508.[19] If the similarities between works are insufficient to prove copying or if it is established that the accused work was independently created without copying, the plaintiff cannot prevail. *Wildlife Express*, 18 F.3d at 508. The perspective of the "ordinary person" governs the assessment of substantial similarity; in particular, "the test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Atari*, 672 F.2d at 614 (citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977)).

 Of course, the protection afforded by the copyright laws is not absolute. Copyright protects only the expression of ideas, not the ideas themselves. 17 U.S.C. § 102(b); *Wildlife Express*, 18 F.3d at 507; *Atari*, 672 F.2d at 614–15. In a related vein, copyright protection does not extend to

---

18. In all, FASA contends that the eleven EXOS-QUAD E-Frames are substantially similar to thirty BattleMechs and OmniMechs. The allegedly infringing E-Frames are identified below, followed, in parentheses, by the BATTLETECH Mechs allegedly infringed by the E-Frame: Command E-Frame (Clan Elemental suit); Stealth E-Frame (Clan Elemental suit, Spider, Battlemaster, Rifleman, Archer, Warhammer, Griffin, Wolverine, Loki, and Jagermech); Amphibious Assault E-Frame (King Crab, Hornet, Mercury, Crab, Hoplite, Masakari, Ryoken, Dragonfly, and Blackhawk); Communications Intelligence E-Frame (Rifleman, Rifleman II, Koshi, and Dashi); Aerial Attack E-Frame (Clan Elemental suit); Rapid Assault E-Frame (Blackhawk, Raven, Masakari, Puma, Dragonfly, and Man O' War); Ground Assault E-Frame (Longbow); Police Enforcer E-Frame (Rifleman and Fenris); Troop Transport E-Frame (Dragonfly, Ryoken, Fenris, and Blackhawk); Field Repair E-Frame (Behemoth and Dasher); and, the EXOSQUAD Heavy Attack E-Frame (MAD CAT). Pls.' Supplemental Objs. & Resps. to Def.'s Set of Interrogs. ¶ 13.

19. As explained in *Stillman v. Leo Burnett Co.*, 720 F.Supp. 1353 (N.D.Ill.1989), in order to prevail on a copyright infringement claim, the plaintiff must show "illicit copying." *Id.* at 1358.

Illicit copying implies more than simple copying; it implies "unlawful appropriation." "[T]o show unlawful appropriation, (i.e., substantial similarity as a matter of law), the plaintiff must demonstrate that the defendant's copying extended to the plaintiff's protectible expression." *Id.* at 1358. This concept of "unlawful appropriation" is embodied in *Wildlife*, by the statement that the plaintiff must show "copying of constituent elements of the work that are original." *Wildlife*, 18 F.3d at 508. It is important to bear in mind that the term "substantial similarity" as used in the context of discussing the circumstantial method of establishing simple copying (*i.e.*, proving access and "substantial similarity") is not equivalent to unlawful appropriation; for in this context, "substantial similarity" is assessed "between the works 'when compared in their entirety including both protectible and unprotectible material.'" *Stillman*, 720 F.Supp. at 1358 (quoting 3 NIMMER ON COPYRIGHT § 13.03[e] at 13–55 (1988)). As further explained in *Stillman:*

the copying/unlawful appropriation dichotomy simply reflects the fact that the copyright laws do not protect ideas, procedures, and concepts, but only the expression of ideas. Copying occurs when a defendant usurps the former; unlawful appropriation, however, requires the purloining of expression as well.
*Id.*

*scenes a faire*—that is, the " 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic.' " *Atari,* 672 F.2d at 616 (quoting *Alexander v. Haley,* 460 F.Supp. 40, 45 (S.D.N.Y.1978)). Also, although copyright protection is afforded to derivative works [20], that protection is not extended to the preexisting material employed in the work. 17 U.S.C. § 103(b) [21]; *see also Saturday Evening Post Co. v. Rumbleseat Press, Inc.,* 816 F.2d 1191, 1193 (7th Cir. 1987) (noting that the copyright protection accorded to derivative works is limited to that portion of the work adding incremental originality beyond the preexisting work).

Playmates' motion for summary judgment on FASA's copyright claims rests principally on the following two propositions: (1) FASA's claims are based on non-protectible elements; and (2) BATTLETECH and EXOSQUAD are not substantially similar. The former proposition—which speaks to the *scope* of FASA's copyright protection (*i.e.,* the extent of the monopoly conferred by the copyright)—has two prongs. First, Playmates argues that FASA is seeking protection of general ideas or themes or *scenes a faire.* Second, Playmates argues that FASA's copyright claims are based on the underlying preexisting works from which its copyrighted material is derived.

The court notes that its task in ruling on the copyright infringement counts has been unnecessarily complicated—and ultimately undermined—by the fact that neither party has shed much light on the exact scope of the copyright protection FASA seeks to invoke. As the moving party on a motion for summary judgment, Playmates carries the initial burden "of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2553.[22] In the present context, Playmates' burden necessarily involves, among other things, ferreting out the parameters of FASA's alleged copyright protection. It is only by first establishing the scope of FASA's copyright protection of the BATTLETECH universe, that Playmates can establish that the EXOSQUAD toy line does not infringe upon that protection.[23] In the same vein, while it is true that Playmates carries the initial burden on a motion for summary judgment, the court must note that FASA, either by accident or design, has consistently been less than precise as to the exact scope of the copyright

**20.** Section 101 of the Copyright Act defines a "derivative work" as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization ..., or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.

**21.** Section 103(b) provides:
The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.
17 U.S.C. § 103(b).

**22.** It is only *after* a properly supported motion for summary judgment has been filed that the burden of production shifts to the nonmoving party to set forth specific facts showing there is no genuine issue for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

**23.** In this regard we note the following. As far as can be discerned from the record, Playmates never directly inquired, through interrogatory or otherwise, as to the precise nature of the preexisting works upon which FASA's derivative material was based. Nor did Playmates inquire directly into the precise scope of FASA's copyright protection—*i.e.,* what, precisely, FASA claimed were its original contributions. (In the absence of direct questions on these issues, it is not surprising that FASA did not offer up the information—for it allowed them to survive the instant motion for summary judgment. However, ultimately FASA will have to show its hand to survive a motion for a directed verdict on these claims.) If, in fact, these questions were asked, Playmates has not directed the court to FASA's answers. In the absence of this critical information, it is inconceivable to this court that Playmates believes it can establish the absence of a genuine issue of material fact on the issues of the scope of FASA's protection or of the substantial similarity of protected expression.

protection it seeks to invoke.[24] Similarly, while FASA acknowledges that the original twenty Mech designs were licensed from Japanese creators, Pls.' Add'l Facts ¶ 5; *see also* Tr. 37[25], FASA has not submitted any evidence regarding these licensed designs. Nor has FASA made any genuine effort to delineate with particularity how its purportedly original designs differ from the initially licensed designs.[26] Indeed, FASA is virtually silent with respect to what constitutes its original—and hence protectible—contributions. Instead of providing the court with the requisite factual record necessary to resolve the issues before it, both parties have simply chosen to heap a mound of exhibits on the court and have the court wade through this thicket and discover what might be considered original and worthy of protection.[27] It is not the court's objective here to apportion fault for the shortcomings in the record; however, we do note that a great deal of time (including that of the court) and client money has been expended on a motion that is ultimately unsuitable for resolution. In this regard, both parties should be apprised of the Seventh Circuit's recent reminder that "a district court need not scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment. Instead, the court can rely upon the non-moving party to show such a dispute if one exists." *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 567 (7th Cir. 1993). Accordingly, in *L.S. Heath & Son,* the court found that the district court did not abuse its discretion in refusing to consider evidence that was not referenced by the non-moving party on a motion for summary judgment. *Id.* at 568. In the instant case, the court has engaged in a needlessly time consuming examination—essentially unguided by any direction from FASA—of the BATTLETECH materials (predominantly supplied by Playmates) in an effort to determine whether any genuine issue of material fact exists. Although, as explained below, FASA survives the motion for summary judgment directed against its copyright claims, it should take note that its survival is principally a function of Playmate's shortcomings rather than its own strengths.

## Scope of FASA's Copyright Protection

█ In support of its argument that FASA's copyright claims are based on the underlying preexisting works from which its copyrighted material is derived, Playmates submitted copies of the thirty BattleMech designs identified by FASA as being substantially similar to the EXOSQUAD toy designs. Additionally, Playmates submitted copies of third-party designs which it contends are similar to the BATTLETECH designs. Second Partridge Decl., Exs. 1–30; *see also* Garcia Decl., Exs. 3–65. The court's examination of the Playmates exhibits reveals that several of the thirty BattleMech designs (*e.g.,* Longbow, Rifleman, Griffin, Warhammer) appear to be materially identical to the third-party designs and in other instances (*e.g.,* Behemoth, Battlemaster), the differences between the BATTLETECH designs and those of the third-parties appear to be trivial. Playmates' submissions certainly raise seri-

**24.** In fact, FASA has not even bothered to submit for the court's review four of the five copyrighted works identified in its complaint. The court knows of no other copyright infringement case in which the plaintiff did not submit the subject copyrighted works for the court's review.

**25.** The court attempted to avoid the very problems mentioned herein by directing the parties to address certain specific issues during oral argument. Citations to "Tr. at __" refer to the transcript of the argument heard in this matter on August 18, 1994.

**26.** Complicating matters, at oral argument FASA's counsel stated that the Japanese works are not the preexisting works underlying FASA's derivative works. Tr. at 41. This statement accurately reflects the copyright registrations which indicate that the preexisting works are

prior FASA works. This introduces another layer in the analysis of what constitutes FASA's original contribution in the copyrighted works at issue in this case: It appears that a proper analysis must examine how the underlying FASA works differ from the licensed Japanese works and then, in turn, how the works that are the subject of this suit differ from the underlying FASA works.

**27.** This type of litigation strategy, whether intentional or not, may have inadvertently benefitted the plaintiff. However, this court will not allow a jury to be treated in a similar fashion and will not hesitate to enter a directed verdict for the defendant if the plaintiff does not meet its burden at trial.

ous questions about the originality—and hence the protectibility—of many of the BATTLETECH designs. However, there are several shortcomings to Playmates' showing which preclude the court from finding that Playmates has met its initial burden as the moving party on a motion for summary judgement, and *a fortiori* is entitled to judgment as a matter of law. First, Playmates failed to clearly identify the source or date of publication of the third-party designs. Hence, the court is unable to determine which, if any, of the third-party designs predate the BATTLETECH designs. As it presently stands, the record is ambiguous as to whether the third-party designs are modeled after the BATTLETECH designs or vice-versa—or whether the designs were independently created without copying. Furthermore, Playmates has submitted no evidence suggesting that FASA had access to any of these particular third-party designs. Presumably, many—if not all—of the third-party designs submitted by Playmates are those originally licensed by FASA from the Japanese; however, this is not clear from the record. Moreover, even if these designs were the originally licensed designs, Playmates makes no effort to parse out the underlying preexisting material from FASA's designs so as to direct the court's attention to the unique aspects of FASA's designs (if any) and to analyze whether or not Playmates' designs are substantially similar to FASA's unique expressive contributions. Instead, Playmates simply offers mounds of exhibits, inviting the court to wade through them and conclude that FASA's designs have no unique (hence protectible) expressive ele-

ments. While the court's visual inspection of the exhibits reveals many similarities, it also reveals many differences which the court cannot discount as inconsequential. Unguided by any direction from Playmates (or FASA for that matter) as to what constitutes preexisting material and the scope of incorporation of that material, the court is in no position to rule as a matter of law on the issue of the scope of FASA's protection or on the issue of substantial similarity. Playmates' submissions raise more questions than they provide answers and on a motion for summary judgment the uncertainties raised by the record must be resolved in FASA's favor. On the record before the court, we cannot conclude that Playmates is entitled to judgment as a matter of law based on the similarity of the BATTLETECH designs to the third-party designs.[28]

■ Nor can the court conclude that Playmates is entitled to judgment as a matter of law based on the argument that FASA is seeking protection of *scenes a faire*. Playmates' suggestion that FASA seeks protection of expressions that are *scenes a faire* or common features in the futuristic robotic genre is cursory and undeveloped. Playmates makes no effort to identify the particular aspects of the BATTLETECH universe which it contends are *scenes a faire* or common to the genre. Because Playmates does not identify any particular examples of *scenes a faire*, its argument must be rejected. The court simply cannot rule in the abstract that certain undefined BATTLETECH features are *scenes a faire*.[29] Ulti-

**28.** Although we cannot hold that Playmates is entitled to judgment as a matter of law, the court emphasizes, for the purpose of providing guidance to the parties, that many of the BATTLETECH designs are materially similar to the third-party designs submitted by Playmates. Indeed, as suggested by Playmates, in several instances the BATTLETECH designs resemble the third-party designs at least as much as the EXOSQUAD designs resemble the BATTLETECH designs. If the third-party designs prove to be the designs licensed by FASA, FASA will unquestionably be confronted with an uphill battle in pursuing its copyright claims based on similarity of the designs. FASA's derivative copyrights do not confer copyright protection to the preexisting material employed in the derivative works, 17 U.S.C. § 103(b); rather, the protection extends

only to FASA's original contribution. As noted in *Atari*, "[w]hile dissection is generally disfavored, the ordinary observer test, in application, must take into account that the copyright laws preclude appropriation of only those elements of the work that are protected by the copyright." 672 F.2d at 614. Thus, in order to prevail on its copyright claims, FASA will ultimately have to establish that the EXOSQUAD E-Frame designs are substantially similar to the BATTLETECH Mech designs *with respect to FASA's original contributions*.

**29.** Moreover, Playmates cannot seriously contend that the BATTLETECH designs themselves are *scenes a faire*. Our review of the exhibits submitted by both FASA and Playmates (includ-

mately, this will be a question of material fact for the trier of fact.

■ As a final assault on the protectibility of the BATTLETECH universe, Playmates contends that FASA is seeking protection of general themes and ideas such as "interstellar battles, genetic engineering, robot-like war machines, or 'brain links' to pilot vehicles." Def.'s Mem. at 7; *see also* Def.'s Reply at 3–4 ("The only articulated similarity between the fictional portions of the works involves a most general, abstract outline— robotic vehicles engaged in interstellar battle involving genetically engineered beings and weapons operated by neural interface."). In view of the record before the court, we must agree.[30]

As a result of FASA's inability or unwillingness to identify concrete details pertaining to the BATTLETECH universe, the court has little choice but to conclude that FASA is impermissibly seeking protection of the following general ideas and concepts: (1) a futuristic, interstellar, battle dominated universe; (2) robot-like battle machines [31]; (3) genetically manipulated warriors; and, (4) direct communication between machine and human brain.[32]

It is, perhaps, telling that FASA has made no genuine effort to direct the court's attention to any particular BATTLETECH expressions of the "futuristic, interstellar, battle dominated BATTLETECH universe."

ing approximately fifteen to twenty videotape film clips and innumerable pictorial images) leaves the court firmly convinced that the BATTLETECH Mech designs are neither standard or indispensable elements of science fiction or, more narrowly, science fiction depictions of robots. Playmates can only argue that the BATTLETECH designs are standard to the genre by defining "the genre" in such a narrow fashion so as to render the argument tautological. However, it is clear from the exhibits—particularly the video clips submitted as Exhibit 1 to the Garcia declaration—that the concept of drivable robots or robotic exoskeletons used as war machines is plainly not original or unique to FASA.

**30.** It should be noted that this court's minute order of July 28, 1994, granting defendant's motion for oral argument specifically directed the parties to address: "What is the extent of FASA's copyright: i.e., What parts of the copyrighted works constitute protectable expressions as opposed to unprotected ideas. . . ."

**31.** *See supra* note 29.

**32.** In addition to concluding that FASA is seeking protection of general ideas and concepts, the court also notes that—at least with respect to the concepts of interstellar, battle dominated universes, drivable giant robots, and genetically manipulated warriors—FASA's claim to originality is open to considerable doubt. In his preface to the English translation of Japanese author Yoshiyuki Tomino's *GUNDAM Mobile Suit (volume I) Awakenings* (1990), translator Frederik L. Schodt observed that the Gundam Mobile Suit, which began in 1979 as an animated television series, "had its roots in a long Japanese tradition of giant warrior robot animated TV shows." Garcia Decl., Ex. 2, at vii. Schodt mentions that the Japanese robots have included " 'drivable' giant robots." *Id.* Also, Schodt notes that, "With GUNDAM, in 1979, [Tomino] . . . abandoned traditional Japanese robot concepts and made the

"Mobile Suit," a type of armored suit or piloted exo-skeleton. *Id.* at viii. The promotional material printed on the back cover of *GUNDAM Mobile Suit* describes a concept strikingly reminiscent of the BATTLETECH universe:

> The GUNDAM story has all the classic elements of great science fiction: a devastating civil war between the Federation of Earth and their rebellious off-world colonies, fought in the far reaches of space . . . and the near reaches of Earth's Moon. The warriors must confront two unforeseen enemies: a "New Type" pilot who possesses a highly evolved (and potentially lethal) consciousness . . . and the enormous humanoid battleships known as Mobile Suits, monstrous and invulnerable.

*Id.* (back cover). The concept of genetically engineered adversaries in interstellar combat can also be found in *ROBOTECH The Role-Playing Game:*

> Eons past, a race known as the Robotech Masters needed an inexpensive labor force to excavate planets with heavy gravity and environments far too harsh for ordinary human life. Using their own body cells and unsurpassed knowledge of genetics and cloning, they created the Zentraedi. However, the Robotech Masters soon found a more daring use for their artificial race of giants. With the alien, Invid, threat becoming ever more annoying, they decided to turn the Zentraedi into a warrior race. Warriors who would devote their lives to defending them against the Invid and conquer new worlds to add to their empire.

Partridge Decl., Ex. 35, ROBOTECH THE ROLE-PLAYING GAME at 82. As in BATTLETECH, these genetically engineered foes battle humans in "giant, robot-like constructions or armored battle suits" known as Mecha. *Id.* at 34. "Weapon systems, such as lasers, auto cannons and missile launchers, are built directly into the Mecha, providing the pilot with more firepower than a dozen tanks." *Id.*

On the record before the court, the court must conclude that insofar as FASA's copyright infringement claim is predicated on the assertion that "[t]he Exosquad lives in a futuristic, interstellar, battle dominated environment significantly resembling the futuristic, interstellar, battle dominated BATTLETECH universe," that aspect of the claim must fail because it rests on familiar general themes which are unprotectible elements. *Cf. Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir.1930) (L. Hand, J.).

Similarly, beyond identifying the Clan Elementals as a "genetically manipulated human race seeking to conquer mankind," *see* Ksander Decl., Ex. 48, Pls.' Supplemental Objs. & Resps. to Def.'s Set of Interrogs., ¶ 13 at 20, FASA has not directed the court to any particular BATTLETECH expressions of the concept of a genetically manipulated strain of humans so as to enable the court to determine whether FASA's expression of the concept has been infringed by the EXOSQUAD neosapiens.[33] Again, on the record before the court, the court must conclude that FASA's reliance on the concept of genetic breeding as a predicate to its copyright infringement claim, improperly relies on unprotectible elements.

The foregoing analysis applies equally to FASA's contention that the "Exosquad operates their E–Frames through computer and weapons systems that communicate directly with the pilot's brain, just as each ME-CHWARRIOR operates his BATTLEMECH through a neural helmet which communicates directly with the pilot's brain[.]" *Id.* Once again, FASA has not directed the court to any references in the BATTLETECH material to the "neural helmet." Thus, once again, this aspect of FASA's copyright claim, as presented by FASA, rests only on the concept—rather than a concrete expression—of a device which enables a machine to communicate directly with a human brain.[34]

■ Citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir.1977), and *Roulo v. Russ Berrie & Co.*, 886 F.2d 931 (7th Cir. 1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990), FASA objects to any item-by-item analysis of its copyright claim (such as the foregoing), arguing that "[it] is inappropriate to 'focus on isolated elements of each of the works to the exclusion of the other elements' or to point out the dissimilarities." Pls.' Mem.Opp.Summ.J. at 8. Rather, FASA insists that the total look and feel of the BATTLETECH universe must be compared with that of the EXOSQUAD. However, insofar as Playmates is challenging the scope of FASA's protection, FASA's argument and reliance on *Krofft* and *Roulo* is inapposite. The statement in *Roulo* (and in *Atari* upon which *Roulo* is premised) that "dissection of the subject matter into copyrighted and unprotected elements is

---

**33.** The court's own perusal of the various BATTLETECH materials submitted by the parties, yielded only the following descriptions of the Clan Elementals which reference their genetic breeding origins: "men and women bred to be foot soldiers." Partridge Decl., Ex. 10, BATTLETECH The Return of Kerensky Technical Readout 3050, at 8; "the product of centuries of selective breeding and superb training." *Id.* at 222. Playmates depicts the Neosapians as "a genetically engineered race created to serve humans as laborers on Mars and Venus...." Def.'s Mem. at 12. *See also* Partridge Decl., Ex. 7, Universal EXOFORCE Materials, at 8, 10. However, the materials submitted by Playmates also reveals that some Neosapien variants were introduced specifically with military objectives—including "a maniacal 'warrior' class with fierce killer instincts, and a towering, horrific physique designed to terrify and intimidate their enemies." Partridge Decl., Ex. 7, at 34. Playmates' 1993 catalog, and the EXOSQUAD toy line packaging, describe the neosapiens as "a genetically engi-neered perfect race." Partridge Decl., Exs. 1–6, 25. (The difference in the spelling of neosapien reflects changes that occurred in the marketing of the toy line.)

**34.** The court's review of the BATTLETECH material revealed only that the BATTLETECH neurohelmet "provides the neurolink between pilot and 'Mech," Ksander Decl., Ex. 25, BATTLETECH Technical Readout 2750 at 159, and that "[t]he standard inner sphere design distributes the neural interface components evenly throughout the helmet[, whereas,] [t]he clan version concentrates these systems in a detachable module at the back of the helmet." Partridge Decl., Ex. 9, MECHWARRIOR The Battletech Role Playing Game (2d ed.) at (unnumbered). Unlike the BATTLETECH neurohelmet, the link between machine and human mind in the EXOSQUAD is accomplished by way of a "cyberjack" which is a plug, originating in the base of the E–Frame, that is inserted into the back of the pilot's battle-suit.

generally rejected in favor of examining the 'total concept and feel' of the copyrighted work," 886 F.2d at 939 (quoting *Atari,* 672 F.2d at 614), was made in the context of analyzing substantial similarity *not,* as is the case here, in the context of determining the scope of copyright protection. As the Ninth Circuit (which penned *Krofft*) recently confirmed, "analytic dissection" in the latter context is wholly proper:

> The district court's analytic dissection of the five groups of features involving unprotected or unprotectable work was also proper.... This analysis had nothing to do with assessing substantial similarity, and therefore was not subject to the old limitations *Krofft* imposed on the use of analytic dissection. Instead, ... the district court applied analytic dissection for the purpose of determining "whether similarities ... result from unprotectable [or unprotected] expression." In this application, analytic dissection is used not for the purposes of comparing similarities and identifying infringement, but for the purpose of defining the scope of plaintiff's copyright.

*Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1475–76 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 198, 121 L.Ed.2d 141 (1992).

It is important to note that all we hold today is that FASA may not predicate its copyright claims on similarities involving unprotectible elements such as the general ideas discussed above. This is not to say that in evaluating the similarity of the BATTLETECH universe and the EXOSQUAD toy line the works will not be compared as a whole. To quote, once again, from the Ninth Circuit:

> As we made clear in *Aliotti,* the party claiming infringement may place "no reliance upon any similarity in expression resulting from" unprotectable elements. Otherwise, there would be no point to ... distinguishing ideas from expression.... This does not mean that at the end of the day, when the works are considered under the [objective substantial similarity] test, they should not be compared as a whole. Nor does it mean that infringement cannot

be based on original selection and arrangement of unprotected elements. However, the unprotectable elements have to be identified, or filtered, before the works can be considered as a whole.

*Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1446 (9th Cir.1994).

*Substantial Similarity*

■ Playmates' contention that EXOSQUAD and BATTLETECH are not substantially similar need not detain us long. As a prefatory remark, we note that summary judgment is not favored on the question of substantial similarity in copyright cases. *See, e.g., Kouf v. Walt Disney Pictures & Television,* 16 F.3d 1042, 1045 n. 3 (9th Cir. 1994); *Shaw v. Lindheim,* 919 F.2d 1353, 1355 (9th Cir.1990); *North American Brown Bear Co. v. Carson Pirie Scott & Co.,* 1991 WL 259031 *1 n. 6, 1991 U.S.Dist. LEXIS 17350 *5 n. 6 (N.D.Ill. Nov. 26, 1991). However, summary judgment may be appropriate where no reasonable factfinder could find substantial similarity in the protected expression of the disputed works. *Kouf,* 16 F.3d at 1045; *Shaw,* 919 F.2d at 1355.

■ Even the most cursory visual comparison of the EXOSQUAD and BATTLETECH materials reveals that there are marked similarities between the two. In particular, we note that the EXOSQUAD Heavy Attack E–Frame appears to be a virtual replica of the BATTLETECH MAD CAT. Because the court cannot conclude that no reasonable trier of fact could find substantial similarity, Playmates' motion for summary judgment on this basis must be denied.

## FASA's Trademark Infringement (Counts V and VI) and Lanham Act Unfair Competition (Counts I) Claims

Counts V and VI of FASA's complaint allege trademark infringement in violation of section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a). In particular, FASA contends that Playmates' promotion and sale of the Heavy Attack E–Frame (Count V) and other ExoFrames that are substantially similar to the designs and images of BATTLETECH BattleMechs and OmniMechs (Count VI) are

likely to cause confusion in the public by misleading them into believing that Playmates' ExoFrames originate from, or are otherwise connected with, FASA.

Section 43(a) of the Lanham Act (as amended) provides, in pertinent part:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such an act.

15 U.S.C. § 1125.

FASA's Lanham Act counts allege infringement of its unregistered trade dress. *See* Tr. at 48 ("The trademark that's being alleged here is our trade dress."). The Seventh Circuit has described "trade dress" as "refer[ring] to the total image of a product, including size, shape, color combinations, graphics, packaging and label." *Badger Meter Inc. v. Grinnell Corp.,* 13 F.3d 1145, 1151 (7th Cir.1994). *See also Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, —— n. 1, 112 S.Ct. 2753, 2755 n. 1, 120 L.Ed.2d 615 (1992). It is established that the "trade dress" of a product may inhere in the design of the product itself. As the court noted in *National Presto Indus., Inc. v. Dazey Corp.,* 18 U.S.P.Q. 2d (BNA) 1113, 1118, 1990 WL 291494 (N.D.Ill.1990), *aff'd,* 949 F.2d 402 (Fed.Cir.1991):

"Trade dress" as the words suggest, originally referred to packaging or displays associated with a manufacturer's goods. The principle has been extended to include a confusing similarity in the appearance of the goods themselves, if this appearance is non-functional and is capable of serving as a trademark—as an indication of the source of the goods. *See, e.g., service Ideas, Inc. v. Traex Corp.,* 846 F.2d 1118 [6 USPQ2d 1937] (7th Cir.1988) (distinctive external appearance of insulated beverage server): *Vaughan Mfg. Co. v. Brikam International, Inc.* 814 F.2d 346 [1 USPQ2D 2067] (7th Cir.1987) (design, materials and color of folding picnic table).

*See also* J. THOMAS MCCARTHY, 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION [hereinafter MCCARTHY ON TRADEMARKS] § 8.01[3] at 8–8 (3d ed.1994) (and cases cited therein) ("While "trade dress" traditionally referred to packaging and labelling of a product, the term has now been stretched to include the shape and design of the product itself.").

In order to prevail on its trade dress infringement claims, FASA must prove that "(1) its trade dress is protectible; and (2) its trade dress was infringed." *Badger Meter,* 13 F.3d at 1151; *see also Rock–A–Bye Baby, Inc. v. Dex Prods., Inc.,* 867 F.Supp. 703, 706 (N.D.Ill.1994). Trade dress is protectible if it is inherently distinctive or if it has acquired distinctiveness through secondary meaning. *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758; *Badger Meter,* 13 F.3d at 1151. Additionally, the infringed trade dress must be nonfunctional. *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758. "Secondary meaning" exists where there is " 'a mental association in buyers' minds between the alleged mark and a single source of the product.' " *Echo Travel, Inc. v. Travel Assocs., Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989) (quoting MCCARTHY ON TRADEMARKS § 15:2 at 659 (2d ed.1984)). It is not necessary that the public be aware of the name of the source. *Id.* Secondary meaning may be established by showing that " 'the public is aware that the product comes from a single, though anonymous source.' " *Id.* at 1267 (quoting *Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366, 380 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976)). Finally, a finding of infringement requires a showing that the defendant's trade dress is sufficiently similar to that of the plaintiff's so as to create a likelihood of confusion on the part of consumers as to the

source of the product. *Id.; Badger Meter,* 13 F.3d at 1151.

Playmates can succeed on a motion for summary judgment only by demonstrating that no genuine issue of material fact exists with respect to either of the following propositions: (1) the BATTLETECH trade dress is not inherently distinctive and has not acquired secondary meaning; or (2) there is no likelihood of confusion between BATTLE-TECH and EXOSQUAD. The issue of whether a given mark has acquired secondary meaning is ordinarily one of fact. *See, e.g., G.H. Mumm & Cie v. Desnoes & Geddes, Ltd.,* 917 F.2d 1292, 1294 (Fed.Cir.1990); *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 614 (9th Cir.1989); *see also* 2 MCCARTHY ON TRADEMARKS § 15.10[2] at 15–45 (and cases cited therein). Also, the Seventh Circuit has admonished on several occasions that " 'the trial court's ultimate conclusion on the likelihood of confusion is a finding of fact.' " *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 616 (7th Cir. 1993) (quoting *Forum Corp. of North Am. v. Forum Ltd.,* 903 F.2d 434, 438 (7th Cir. 1990)). "Accordingly, a motion for summary judgment in trademark infringement cases must be approached with great caution." *Id.*

Playmates' principal contention with respect to FASA's trade dress infringement claims is that FASA cannot establish secondary meaning in light of "widespread third party use of the same elements." Def.'s Reply at 10. In considering whether a mark has acquired secondary meaning, courts generally consider the following factors:

*Direct Evidence*

(a) direct consumer testimony

(b) consumer surveys

*Circumstantial Evidence*

(c) exclusivity, length, and manner of use

(d) amount and manner of advertising

(e) amount of sales and number of customers

(f) established place in the market

(g) proof of intentional copying.

*Echo Travel,* 870 F.2d at 1267; *see also Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 393 (7th Cir.1992).

Insofar as Playmates' argument merely refers to the existence of "the same elements" in third party works without any specific evidence bearing more directly on secondary meaning, Playmates' showing falls short of demonstrating the lack of a genuine issue of material fact. Playmates has made no showing whatsoever with respect to how widespread the purported third party use is. Along these lines, it is worth noting that some of the third party material appears to be Japanese, and Playmates has provided no evidence that this material is distributed, sold or advertised in the United States. Thus, while Playmates may have established the existence of *some* third party use of similar—if not some of the same—designs, we find this showing, standing alone, to be insufficient to meet Playmates' initial burden of identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.[35] For this reason alone, Playmates' motion for summary judgment on counts V and VI must be denied.[36]

**35.** As one commentator has observed:
While some cases indicate that plaintiff's use must have been exclusive, the majority of cases say that the issue is not whether plaintiff's use was exclusive, but whether plaintiff's use of the mark had achieved secondary meaning, as opposed to anyone else's use of a similar mark. Widespread use by third parties is, however, evidence in support of a lack of secondary meaning. Where purchasers are faced with more than one independent user of a term, this is evidence that distinctiveness is lacking.
2 MCCARTHY ON TRADEMARKS § 15.09 at 15–43.

**36.** Playmates' citation to *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176 (7th Cir.1989), for the proposition that "trade dress protection does not extend to features already shared by different brands on the market," *id.* at 1190, is misplaced. In the first place, the record in *Schwinn* supported the conclusion that the shared features were *commonly used* for years. *Id.* at 1189–90. There is no such showing in the case at bar. Moreover, it is apparent from the cases cited in the footnote accompanying the quoted passage—*viz., Service Ideas, Inc. v. Traex Corp.,* 846 F.2d 1118, 1123 (7th Cir.1988), and *W.T. Rogers Co. v. Keene,* 778 F.2d 334, 339 (7th Cir.1985)—that the "shared" features referred to were functional features.

In opposition to Playmates' motion, FASA submitted a variety of circumstantial evidence of secondary meaning.[37] The most probative of this circumstantial evidence is FASA's evidence of intentional copying. FASA points to the fact that, shortly after receiving BATTLETECH product—including the *BATTLETECH Compendium*—from Robert Allen, Playmates hired freelance designer Russell Edmisson to prepare drawings and prototypes for Playmates' use in promoting toys. *See* Ksander Decl., Exs. 27 & 28. Edmisson testified that Playmates' Richard Sallis instructed him that he (Sallis) "wanted to have a hulking robot ... with as much firepower ... as we could possibly have." Edmisson Dep. at 26. When asked if Sallis presented him with any examples of what he wanted, Edmisson replied that Sallis "had some sheets torn out of magazines." *Id.*[38] When shown the EXOSQUAD section of Playmates' catalog and asked if the Heavy Attack E–Frame pictured there was the toy prototype he produced, Edmisson replied, "Looks like it." *Id.* at 52. In view of Sallis' access to the *BATTLETECH Compendium*—which features the MAD CAT—and the striking similarity between the prototype produced at his behest (which later became the Heavy Attack E–Frame) and the MAD CAT—a similarity too striking to ascribe to coincidence, FASA's evidence of copying must be given weight as evidence of secondary meaning. *See Vaughan Mfg. Co. v. Brikam Int'l, Inc.*, 814 F.2d 346, 349 (7th Cir. 1987) (noting that proof of intentional copying is probative evidence of secondary meaning); *see also* 2 MCCARTHY ON TRADEMARKS § 15.12[2] at 15–56 (noting that the majority view is that "evidence of copying is probative, but not determinative, of secondary meaning"). In fact, we find the evidence sufficient to raise a genuine issue of material fact as to whether the MAD CAT has acquired secondary meaning.

The remainder of FASA's circumstantial evidence is far less probative and so we shall discuss it only briefly. FASA submitted circumstantial evidence relating to its sales and marketing efforts—all of which is relatively weak evidence of secondary meaning. For instance, in an attempt to demonstrate its amount of sales and number of customers, FASA submitted a table presenting its unit sales of BATTLETECH-related products.[39] Ksander Decl., Ex. 8. While some of the figures appear to be high, it is impossible to draw any meaningful inferences from this data without relevant comparative data. Nevertheless, the court does not discount the fact that FASA has submitted evidence suggesting that it has promoted its Mech images for approximately ten years and that it enjoys substantial sales of its products.

Similarly, in an apparent attempt to demonstrate its place in the market, FASA also submitted a bar graph published in 1986 by *Model Retailer* magazine based on a survey of retailers that is entitled "Model Retailer's 'What's selling' survey, 1986". Ksander Decl., Ex. 6. Although the graph suggests that BATTLETECH led the 1986 market in game sales, it is of little probative value.[40]

---

37. FASA presented no direct evidence of secondary meaning in the form of consumer surveys or direct consumer testimony.

38. While Edmisson testified that he never saw BATTLETECH books or other materials, Edmisson Dep. at 64, and that the prototype he made was independently created from model kits, without regard to BATTLETECH, *id.* at 35–46, he also testified that he could not recall precisely what the material Sallis showed him was, *id.* at 26, 32. At the very least, there is a genuine question as to whether Sallis showed Edmisson BATTLETECH pages torn from the retained BATTLETECH works and whether Edmisson's prototype was the product of direct copying—even if accomplished only through Sallis' direction.

39. FASA also submitted Jordan Weisman's declaration in which he states: "To date, ticket sales from the virtual reality BATTLETECH game exceed $6,900,000." Ksander Decl., Ex. 2.

40. In the first place the number of survey respondents is not identified so it is impossible to determine the adequacy of the data base upon which the graph is based. Second, the graph presents data for only one year of sales. Data for only one year is wholly insufficient to establish BATTLETECH's overall sales or place in the market. Moreover, it appears as if the 1986 data may present a less than accurate picture: One of FASA's exhibits indicates that the 1986 sales of the BATTLETECH game exceeded sales in every other year by approximately ten thousand units. *See* Ksander Decl., Ex. 8, at 1. (In 1986, 38,883 units of the BATTLETECH game were sold.

Finally, FASA submitted a variety of media reports (both print and television) regarding various BATTLETECH products and the BATTLETECH interactive gaming centers. *See, e.g.,* Ksander Decl., Exs. 2, 8, 12–14. While the reports are certainly complimentary—variously referring to BATTLE-TECH as a "phenomenon" and "the hottest thing in the game world since the invention of dice," Ksander Decl., Ex. 7—the material barely mentions FASA's BattleMech designs. Thus, although the material may speak to BATTLETECH's emerging success and popularity, it does not necessarily support directly FASA's claim that its BattleMech designs have acquired secondary meaning.

The present record is largely silent on the amount and manner of FASA's advertising. The only FASA promotional pieces submitted to the court are a piece on the BATTLE-TECH interactional gaming center—which features an image of the MAD CAT Omni-Mech on the cover, Ksander Decl.Ex. 11, and a 1994 FASA catalog—which contains many images of BATTLETECH Mechs, Ksander Decl., Ex. 9. FASA provided no information on the extent to which these promotional pieces have been distributed. However, the court does note that on three BATTLE-TECH products submitted by FASA—the BATTLETECH Game (2d. ed.), *BATTLE-TECH Technical Readout 2750,* and the *BATTLETECH Compendium,* Mech images appear prominently on the covers. The record also reflects that 220,894, 51,741, and 85,153 units of each of these items have been sold. Ksander Decl., Ex. 8.

■ In summary, while Playmates has raised serious questions about the viability of FASA's contention that its designs (other than the MAD CAT) have acquired second-

ary meaning, we cannot conclude on the total factual record before the court that Playmates has demonstrated the lack of a triable issue. At the outset, Playmates' has not met its burden of identifying the absence of any genuine issue of material fact. Moreover, although the majority of FASA's circumstantial evidence of secondary meaning is of minimal probative value when considered individually, FASA's evidence of intentional copying of the MAD CAT is sufficiently probative to raise a genuine issue as to this element (Count V) especially when coupled with the total circumstantial evidence. Moreover, we find the evidence of intentional copying, in conjunction with the similarity between the Heavy Attack E–Frame and the MAD CAT sufficient to raise a genuine issue as to likelihood of confusion. *See Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 613 (7th Cir.1965); *see also* 2 MCCARTHY ON TRADE-MARKS § 23–34. Additionally, with respect to count VI, after carefully comparing Playmates' E–Frames and FASA's Mech designs, we also find sufficient resemblance to raise a genuine issue as to likelihood of confusion.[41] For the forgoing reasons, Playmates' motion for summary judgment as to FASA's trademark counts (counts V and VI) is denied.

Additionally, because Playmates has advanced no separate arguments supporting summary judgment in its favor on FASA's Lanham Act unfair competition claim (count I), we deny Playmates' motion as to this count for the same reasons.

**FASA's Claims for Dilution (Counts VII and VIII)**

■ FASA seeks relief under Illinois' Anti–Dilution Statute which provides in pertinent part:

Sales in the years 1985 through 1993, inclusive, ranged from 13,307 units in 1985 to 28,791 in 1992. Ksander Decl., Ex. 8, at 1.) Third, the graph appears to present data only for "games." Notwithstanding the title of the graph, it is not clear to the court that certain other relevant products—such as toys and models—fall within the scope of the graph. Finally, the graph is somewhat unintelligible because its y-axis is not labelled; consequently, it is impossible to discern precisely what the graph reveals.

**41.** In addition to similarity of appearance, courts generally consider the following factors when evaluating the likelihood of confusion in trademark infringement claims: similarity of the products; area and manner of concurrent use; degree of care likely to be exercised by consumers; strength of the complainant's trade dress; actual confusion; and intent of the defendant to "palm off" its product as that of the complainant. *See Badger Meter,* 13 F.3d at 1152. The parties have made no serious effort at addressing these factors and therefore the court shall not engage in an analysis of them.

Every person [or] association ... adopting and using a mark, trade name, label or form of advertisement may proceed by suit, and the circuit court shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement if there exists a likelihood of ... dilution of the distinctive quality of the mark, trade name, label or form of advertisement of the prior user, notwithstanding the absence of competition between the parties....

765 ILCS 1035/15 (1993). In *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.*, 746 F.2d 375 (7th Cir.1984), the Seventh Circuit held that a plaintiff could not claim protection against a competitor under the Anti-Dilution Statute, noting that "the Illinois courts have consistently held that the protections of the Anti-Dilution Statute are unavailable to competitors." *Id.* at 380. More recently, in *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir. 1993), the Seventh Circuit reiterated that "under modern state precedent the protection of the Illinois Anti-Dilution statute is not available to competitors...." Accordingly, if the court finds FASA and Playmates to be competitors, FASA's claim for relief under the Illinois Anti-Dilution statute cannot stand.

In its second set of Requests for Admissions, Playmates propounded the following fact for admission by FASA: "The parties, directly or through licensees, are competitors in the toy business." While stating a boilerplate objection to the request as overbroad and unduly vague, FASA responded:

Plaintiffs admit that to the extent FASA markets, either directly or indirectly, games and other game products which may fall within a broad definition of "toys," it is in competition with Playmates. Plaintiffs further admit that to the extent FASA's licensee, Tyco, is in the process of developing a BATTLETECH, "toy" line, it is or will be in competition with Playmates.

Pls.' Admis. ¶ 61. Even in the absence of this admission by FASA, there can be no serious question as to the fact that FASA and Playmates are in competition for market share in the area of futuristic toy products. This lawsuit arises directly out of FASA's efforts—ultimately successful—to find a toy manufacturer to produce a toy line of futuristic robot-like models and Playmates' production of a competing line of toys. Accordingly, the court finds that FASA and Playmates are competitors. Therefore, FASA may not claim protection under Illinois' Anti-Dilution Statute and Playmates' motion for summary judgment in its favor on count VIII is granted.

### FASA's Claim for Tortious Interference With Prospective Business Advantage (Count IX) and Common Law Unfair Competition (Count II)

FASA's ninth and final count asserts a claim for tortious interference with prospective business advantage. Illinois courts recognize the tort of interference with prospective business (or economic) advantage. *See Fellhauer v. City of Geneva*, 142 Ill.2d 495, 511, 154 Ill.Dec. 649, 656–57, 568 N.E.2d 870, 877–78 (1991). To prevail on such a claim, a plaintiff must prove: "(1) [its] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Id.*, 142 Ill.2d at 511, 154 Ill.Dec. at 657, 568 N.E.2d at 878.

In moving for summary judgment on this count, Playmates does not attack the substantive merits of FASA's claim; rather, Playmates argues that the claim is preempted by federal copyright law. Section 301(a) of the Copyright Act provides:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter,

no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State. 17 U.S.C. § 301(a). Thus, section 301(a) expressly preempts state created rights that are equivalent to any of the rights established by a federal copyright. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 674 n. 20 (7th Cir. 1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). The provision establishes two conditions that must be met for preemption of a state created right: "First, the work in which the right is asserted must be fixed in tangible form and come within the subject matter of copyright as specified in § 102. Second, the right must be equivalent to any of the rights specified in § 106." *Id.* at 674.[42] Playmates' motion for summary judgment as to count IX challenges FASA's ability to satisfy the latter condition. In particular, Playmates contends that "FASA's interference claim rests solely on the identical acts that are alleged to constitute a copyright infringement," Def.'s Mem. at 5, and hence the rights asserted by FASA are equivalent to those established by the Copyright Act. Accordingly, we shall focus our discussion on this issue.

The Seventh Circuit has framed the "equivalence" analysis as follows:

A right under state law is "equivalent" to one of the rights within the general scope of copyright if it is violated by any of the rights set forth in § 106. That section grants the owner of a copyright the exclusive rights to reproduce (whether in original or derivative form), distribute, perform, and display the copyrighted work. Thus, a right is equivalent to one of the rights comprised by a copyright if it "is infringed by the mere act of reproduction, performance, distribution or display."

*Baltimore Orioles,* 805 F.2d at 676–77 (citations omitted). Additionally, where a state created right "requires additional elements to make out a cause of action, but the additional elements do not differ in kind from those necessary for copyright infringement," the right is equivalent to a copyright. *Id.* at 678 n. 26.

Other courts addressing the issue of whether state law claims for tortious interference with contract (or prospective advantage) are preempted have generally concluded that such claims are preempted. *See, e.g., Harper & Row, Publishers, Inc. v. Nation Enters.,* 501 F.Supp. 848, 852–54 (S.D.N.Y. 1980), *aff'd in pertinent part and rev'd on other grounds,* 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Long v. Quality Computers & Applications, Inc.,* 860 F.Supp. 191, 196–97 (M.D.Pa.1994); *Acuff–Rose Music, Inc. v. Campbell,* 754 F.Supp. 1150, 1159–60 (M.D.Tenn.1991), *rev'd on other grounds,* 972 F.2d 1429 (6th Cir. 1992), *rev'd on other grounds,* — U.S. —, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994); *Pacific & S. Co. v. Satellite Broadcast Networks, Inc.,* 694 F.Supp. 1565, 1572–73 (N.D.Ga.1988), *rev'd on other grounds,* 940 F.2d 1467 (11th Cir.1991); *Gemcraft Homes, Inc. v. Sumurdy,* 688 F.Supp. 289, 295 (E.D.Tex.1988); *Motown Record Corp. v. George A. Hormel & Co.,* 657 F.Supp. 1236, 1240 (C.D.Cal.1987); *McNabb Bennett & Assocs., Inc. v. Terp Meyers Architects,* 1986 WL 7051 *4–*5 (N.D.Ill. June 11, 1986); *but see Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.,* 7 F.3d 1434, 1442 (9th Cir. 1993) (stating without explanation that a claim for tortious interference with contract includes the requisite extra element necessary to avoid preemption).[43] In concluding

---

**42.** Section 106 provides that the owner of a copyright has exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership . . . ;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and

motion pictures . . . , to perform the copyrighted works publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, . . . to display the copyrighted work publicly.

17 U.S.C. § 106.

**43.** Although it is difficult to determine, it appears that the *Summit* court regarded the "knowledge" and "intent" elements of a tortious interference claim to provide the extra element necessary to

that the plaintiff's tortious interference with contract count was preempted in *Harper & Row*, the district court noted:

> The contractual right sought to be protected is closely analogous to the exclusive rights granted copyright holders under § 106 of the Copyright Act. It is the right to "prepare derivative works based upon the copyrighted work," and "to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership."

501 F.Supp. at 853. Additionally, the court reasoned that the fact that the tortious interference claim required additional elements of awareness and intentional interference with contract did not preclude a finding of preemption because such elements do not render the asserted right "different in kind" from those protected under copyright. *Id.* at 853–54. In affirming the district court's preemption decision, the Second Circuit advanced parallel arguments and further noted, with respect to both the state law claim and the copyright infringement claim, that "it is the act of unauthorized publication which causes the violation." 723 F.2d at 201.

In the case at bar, Playmates contends that, as in *Harper & Row*, FASA's tortious interference claim is predicated on precisely the same conduct underlying its copyright infringement counts. Playmates seizes upon the following deposition testimony by Morton Weisman, FASA's CEO, as support for its contention that the only act allegedly interfering with FASA's business plans was the display and distribution of an infringing toy line:

> Q. Other than presenting a toy line that you claim is a ripoff, is there anything else that Playmates did to interfere with your dealings with Tyco?

avoid preemption. *See* 7 F.3d at 1442. In so doing, the Ninth Circuit diverged from the Second Circuit's analysis in *Harper & Row* in which the court reasoned that such elements "go[] merely to the scope of the right; [they do] not establish qualitatively different conduct on the part of the infringing party, nor a fundamental nonequivalence between the state and federal rights implicated." 723 F.2d at 201. This court concurs with the Second Circuit's analysis and hence respectfully declines to follow *Summit*.

> MS. KSANDER: To the extent that you know.
> THE WITNESS: I know of no—to the extent I know, I know of none.
> . . . .
> Q. The only act by Playmates, as I understand you then, that prevents you from going ahead as planned is that they have announced that they will introduce a competing toy line that you believe is a ripoff.
> MS. KSANDER: I object to that. I think that is a complete mischaracterization of his testimony. . . . .
> A. The answer is yes.

M. Weisman Dep. at 81–82, 86–87. Of course, the foregoing testimony is somewhat ambiguous insofar as the expression "ripoff" is not self-defining. In opposition to Playmates' motion, FASA submitted Mr. Weisman's declaration in which he states, in relevant part:

> Mr. Partridge asked me a series of questions in which he referred to the presentation of EXOSQUAD as a "ripoff." I interpreted his reference to "ripoff" to include all of the claims my company has made in its lawsuit against Playmates. It is my understanding that Playmates has argued that my response should be interpreted to include only FASA's copyright claim. Such an interpretation is not accurate.

Ksander Decl., Ex. 4, M. Weisman Decl. ¶ 6. In view of Mr. Weisman's declaration and the ambiguity in his deposition testimony, it is clear that the deposition testimony is not dispositive of the issue at hand. Instead, the court must examine the specific claims being made by FASA and the factual record supporting those claims.[44]

FASA argues that "[e]ven a cursory examination of the complaint demonstrates that this claim is predicated upon wrongful con-

44. As suggested by the court in *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F.Supp. 1523, 1534–35 (S.D.N.Y.1985), it is of little use to look simply to the labels of causes of action asserted by the plaintiff because courts have variously found the same causes of action preempted or not as a function of the defendants' underlying conduct—and hence, the rights asserted by the plaintiff.

duct which [in addition to copyright infringement] includes misrepresentation and passing off in violation of federal statutory and common law." Pls.' Mem. at 11–12. Indeed, FASA's tortious interference count incorporates by reference allegations from both of the unfair competition counts and both of the trademark counts as well as the copyright counts. *See* Compl. ¶ 111. Thus, for purposes of analyzing the preemption question, we can only conclude that FASA's tortious interference count is, in fact, predicated on wrongful conduct such as misrepresentation and passing off. Nevertheless, our task remains to examine FASA's specific allegations and supporting record to determine whether FASA is, in fact, merely asserting rights equivalent to those established by the Copyright Act—notwithstanding the labels "misrepresentation" and "passing off." [45]

FASA's contention that the tortious interference count is predicated on acts of misrepresentation appears to be based on that count's incorporation by reference of paragraphs from the federal and state unfair competition counts to the effect that Playmates was using false, misleading and deceptive descriptions and representations of fact, Compl. ¶¶ 50, 51, a false designation of origin, *id.* ¶ 52, and was engaging in conduct intended to confuse and deceive the public, *id.* ¶ 60.

However, at their core, it cannot be disputed that FASA's unfair competition counts are predicated on exactly the same conduct as that underlying the copyright counts—*viz.*, copying unique designs, images, descriptions, characteristics and other elements of the BATTLETECH universe. FASA's copyright counts seek protection of its "unique designs, images, descriptions, characteristics and other elements ...," *id.* ¶¶ 65, 66, 75, and allege that Playmates infringed its rights by manufacturing, promoting or offering for sale EXOSQUAD toys substantially similar to the unique designs, *id.* ¶¶ 68, 78. Similarly, the unfair competition counts allege that "Playmates' selection, adoption and unauthorized use of the unique designs, images, descriptions, characteristics and other elements of the BATTLETECH universe ... in its ExoSquad toy line constitutes [federal and common law] unfair competition." *Id.* ¶¶ 49, 59.

Moreover, it is evident from FASA's supplemental response to Playmates' interrogatory inquiring as to the nature of the alleged false, misleading, or deceptive descriptions of fact, that the alleged misrepresentations inhere in Playmates' very act of copying:

> Plaintiffs respond that the statements, representations and descriptions of the ExoSquad toy line contained in the 1993 Playmates Toy Catalogue, 1994 Playmates Toy Catalogue, the packaging for each ExoSquad toy and the advertising for those toys is false, misleading and deceptive in that these statements, representations and descriptions utilize designs, images, descriptions, characteristics and other elements of the BATTLETECH universe, as well as designs, images, descriptions, characteristics and other elements which are substantially similar to those contained in the BATTLETECH universe and falsely represented them as ExoSquad in a manner designed and intended to confuse the public....

Pls.' Supp. Objs. & Resps. to Def.'s Set of Interrogs., ¶ 12. To the extent that there is any act beyond that of copying underlying FASA's charge of misrepresentation, it appears to be only that Playmates sold the allegedly infringing works under Playmates' EXOSQUAD label. However, virtually every copyright infringement claim inherently involves this minimal degree of misrepresentation as to the creator of the allegedly infringing work. To permit state law claims to go forward under this theory of misrepresentation would effectively render the Copyright Act's preemption a nullity. Accordingly, we cannot conclude that an allegation of misrepresentation based solely on an alleged infringer's act of displaying, selling, or promoting the infringing work as his or her own creation, is sufficient to remove a state based

---

45. The court limits its analysis to misrepresentation and passing off because these are the only acts of misconduct identified by FASA.

claim from the preemptive reach of 17 U.S.C. § 301(a).

To the extent that FASA seeks to premise its tortious interference claim on alleged "passing off" (or more precisely "reverse passing off") by Playmates, the claim fares no better. " 'Passing off' involves 'the selling of a good or service of one's own creation under the name or mark of another.' " *Web Printing Controls Co. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1203 n. 1 (7th Cir.1990) (quoting *Smith v. Montoro*, 648 F.2d 602, 604 (9th Cir.1981)). It is generally recognized that unfair competition claims premised on "passing off" are not preempted by the Copyright Act. *See, e.g., Xerox Corp. v. Apple Computer, Inc.*, 734 F.Supp. 1542, 1550, n. 15 (N.D.Cal.1990); 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT [hereinafter NIMMER ON COPYRIGHT] § 1.01[B][1][*e* ] at 1–24 (1994). In contrast, " 'reverse passing off' ... occurs 'when a person removes or obliterates the original trademark, without authorization, before reselling goods produced by someone else.' " *Web Printing*, 906 F.2d at 1203 n. 1 (quoting *Smith*, 648 F.2d at 605); *see also Waldman Publishing Corp. v. Landoll, Inc.*, 848 F.Supp. 498, 500–501 (S.D.N.Y.1994) (defining "reverse passing off" simply as where "the wrongdoer sells plaintiff's products as its own").[46] Courts and commentators have not consistently answered the question of whether a state law claim premised on reverse passing off is preempted by the Copyright Act. Professor Nimmer suggests that such claims are indeed preempted. In a footnote to his remark that state unfair competition claims "of the 'passing off' variety" are not preempted, Professor Nimmer remarks:

If *A* claims that *B* is selling *B* 's products and representing to the public that they are *A* 's, that is passing off. If, by contrast, *B* is selling *B* 's products and representing to the public that they are *B* 's, that is not passing off. A claim that the latter activity is actionable because *B* 's product replicates *A* 's, even if denom-

inated "passing off," is in fact a disguised copyright infringement claim, and hence preempted.

1 NIMMER ON COPYRIGHT § 1.01[B][1][*e* ] at 1–24 n. 110. In accord, the *Waldman* court rejected plaintiffs' argument "that their common law passing off claim was not preempted because one of the elements required for a claim of 'passing off' is the misrepresentation of a common source, which is not an element of a cause of action for copyright." 848 F.Supp. at 505. Although noting authority for the proposition that "passing off" claims are generally not preempted, the court stated:

Plaintiffs, however, have not pled a traditional passing off claim, but a reverse passing off. Where a plaintiff claims that defendant has copied plaintiffs' [sic] product and sold it under defendant's name, that claim of reverse passing off is preempted by the Copyright Act.

*Id.*

Similarly, in *Kregos v. Associated Press*, 3 F.3d 656 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994), the creator of certain "pitching forms"—compilations of statistics on baseball pitchers—sued the Associated Press under theories of copyright infringement, common law fraud, and state unfair competition for allegedly unlawfully using his forms and publishing the copied forms bearing someone else's copyright notice. The Second Circuit affirmed the district court's holding that Kregos' unfair competition claim was preempted by the Copyright Act, finding that it was effectively based solely on the unauthorized copying of his protected expression. 3 F.3d at 665–66. The court quoted the district court with approval, stating:

The mere reproduction of Kregos' form by the AP, without any signature of false copyright notice [or] or any outward sign of ownership, could itself support a state claim for false designation of ownership. The appearance of a pitching form in a newspaper's sports page, if not expressly

---

46. As *Waldman* makes clear, reverse passing off is not limited to those situations in which the wrongdoer literally sells the physical product of another. The doctrine is equally applicable to

cases, such as the one at bar, in which the wrongdoer is charged with selling unauthorized copies under his or her own name. 848 F.Supp. at 503.

attributing the work to someone else, implies that the form was the creation of a person on the newspaper's staff.

*Id.* at 666 (quoting *Kregos v. Associated Press,* 795 F.Supp. 1325, 1337 (S.D.N.Y. 1992)). Because the mere act of unauthorized reproduction implicitly falsely designated the origin of the work, the court held that the state-law right fell squarely within the subject matter of copyright and was therefore preempted. *Id.*

Finally, in *Xerox Corp. v. Apple Computer, Inc.,* 734 F.Supp. 1542 (N.D.Cal.1990), a copyright infringement action involving certain computer languages and devices, the court similarly found state law unfair competition claims premised on reverse passing off to be preempted, noting:

> Xerox alleges that Apple is selling Xerox' work as its own. Xerox' theory, thus, is based upon the premise that Apple's products incorporate elements copyrighted by Xerox and misappropriated by Apple—unlawfully copied in violation of § 103(a) of the Copyright Act. This theory is the opposite of "passing off" and must necessarily be viewed as part of Xerox' copyright claim. Any such misappropriation

must be redressed, if at all, under federal law.

*Id.* at 1550.

We find the instant case to be materially indistinguishable from *Waldman, Kregos,* and *Xerox.*[47] In each, the basis for the finding of preemption was that the state law claims ultimately rested on the mere act of unauthorized copying. The fact that the defendants were selling the allegedly infringing works under their own names—and, hence, implicitly misrepresenting the origin of the works or causing confusion in the consuming public—did not alter the analysis. In particular, in all of these cases, this fact was not regarded as so qualitatively altering the nature of the underlying infringement as to take the state based claims out of the preemptive scope of copyright. In the case at bar, FASA has submitted no evidence suggesting that Playmates "passed off" FASA's product as its own in any way other than allegedly copying designs and other elements of the BATTLETECH universe and selling them as Playmates' EXOSQUAD.[48] As we observed above in the context of discussing FASA's misrepresentation argument, if this conduct were sufficient to justify saving a state law claim from preemption, virtually every copyright claim would support a

---

**47.** *But see Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.,* 7 F.3d 1434, 1441–1442 (9th Cir.1993) (holding, without discussion, that state claim based on reverse palming off is not preempted). We respectfully decline to follow *Summit* for two reasons. First, the authority cited in *Summit* as support for the proposition that state laws which seek to prevent reverse palming off are not preempted by federal law—namely, *Tveter v. AB Turn–O–Matic,* 633 F.2d 831, 839 (9th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1983, 68 L.Ed.2d 300 (1981)—does not actually support this proposition: *Tveter* was conceptualized not as a reverse palming off case, but rather a direct palming off case. *See Tveter,* 633 F.2d at 838 (noting that the district court held that the defendant "had engaged in unfair competition by 'palming off' [his product] as that produced by [plaintiff]" and noting that the defendant had, *inter alia,* sold his product to customers who had ordered the plaintiff's product by name.) Thus, *Tveter* did not even involve a reverse palming off situation. Second, and more significantly, *Tveter* plainly did not involve conduct that was limited to mere reproduction. Where, as in the instant case, a plaintiff makes no predicate showing for its state law claim beyond the defendant's act of reproduction and

sale of the infringing product under the defendant's label, we find that redress for that conduct must be sought under federal law.

**48.** By way of contrast, in *Rubin v. Brooks/Cole Publishing Co.,* 836 F.Supp. 909 (D.Mass.1993), wherein the court held a state law unfair business practices claim not to be preempted, the defendant, who had reprinted the plaintiff's "Love Scale"—a measure of romantic love—in a social psychology textbook, also misrepresented that the scale was "[r]eprinted with permission." *Id.* at 924. The *Rubin* court noted that: "It is clear beyond peradventure ... that the claim is preempted to the extent it is based directly upon Brooks/Cole's reproduction of the Love Scale, Brooks/Cole's failure to obtain Rubin's permission ..., and Brooks/Cole's continued use of the Love Scale after Rubin's initial and subsequent objections." *Id.* However, the court found that the defendant's improper representation of permission added an extra element of misrepresentation and deceit beyond mere reproduction. Based on that extra element, the plaintiff's unfair business practices claim was held to survive preemption. In the case at bar, we are aware of no similar extra act of misrepresentation beyond copying.

state law unfair competition claim. We cannot sanction such a result. In the absence of any other showing of wrongdoing, we find that FASA's tortious interference claim falls squarely within the scope of copyright and is therefore preempted.

■■■ Although Playmates did not expressly move for summary judgment on FASA's state common law unfair competition claim (Count II), we find that the foregoing discussion compels the conclusion that this claim is also preempted by the Copyright Act. It appears evident that FASA's state unfair competition claim is based on acts of misrepresentation and reverse passing off which, in turn, are predicated on Playmates' alleged copying of designs and other elements of the BATTLETECH universe. Because the court's analysis of FASA's charges of misrepresentation and reverse passing off leads to the conclusion that the rights asserted by FASA are equivalent to those established by copyright, we find that FASA must vindicate those rights under federal law. Accordingly, we hold that Count II is preempted.

## CONCLUSION

Playmates' motion for summary judgment is granted in part and denied in part. Summary judgment in favor of Playmates Toys, Inc. and against plaintiffs FASA Corporation and Virtual World Entertainment is entered as to counts II (common law unfair competition), VII (anti-dilution), VIII (anti-dilution) and IX (tortious interference). The motion is denied in all other respects. Accordingly, plaintiffs' Lanham Act unfair competition count (Count I), copyright infringement counts (Counts III and IV), and trademark infringement counts (Counts V and VI) remain for trial.

At this point, it is worthwhile to review some of the major outstanding issues identified in this opinion and requiring resolution

at, or prior to, trial. *See* FED.R.CIV.P. 56(d). During the trial of this case, in accord with this opinion, the parties will need to address whether Allen acted within the scope of his actual or ostensible authority when he signed Playmates' waiver. Regarding the copyright claims, most significant, of course, is the issue of the scope of FASA's protectible interests in the BATTLETECH universe. While falling short of demonstrating its entitlement to judgment as a matter of law, Playmates has raised serious questions concerning the viability of FASA's remaining copyright claims. Playmates has put the scope of FASA's copyright protection squarely into issue. Before this court will allow this case to be submitted to a jury, FASA must come forward and identify with particularity what it claims is covered by its registered copyrights. In so doing, FASA must identify with particularity the preexisting works from which its derivative works are derived and it must identify with particularity the designs it originally licensed from third-parties. To the extent that FASA contends that its designs differ from the preexisting works, licensed designs, or other third-party designs identified by Playmates and submitted to the court in support of Playmates' motion for summary judgment (particularly, the Robotech and Macross designs), FASA must identify specifically how its designs differ.[49] With respect to FASA's trademark infringement claims, it is apparent that the central issue remaining for trial centers on secondary meaning.

FASA shall designate all of its expert witnesses and comply with FED.R.CIV.P. 26(a)(2) by January 9, 1995. Playmates shall designate all of its expert witnesses and comply with FED.R.CIV.P. 26(a)(2) by February 28, 1995. Expert discovery shall be completed by March 31, 1995. A final pretrial order shall be due on April 28, 1995. The case is set for a status on January 10, 1995 at 9:00

---

**49.** In the same vein, having reviewed the various exhibits submitted in this matter, the court is not unmindful of the marked similarities between Playmates' EXOSQUAD designs and images and those of the BATTLETECH universe. Assuming that FASA is able to make the showing outlined above and establish that it has protectible interests in the Mech designs, Playmates will have to do much more than conclusorily assert that its products are not substantially similar to those of FASA. Playmates should be prepared to identify specific, and nontrivial design features that distinguish its ExoFrame designs from the BATTLE-TECH Mech designs.

a.m. for the express purpose of setting a firm trial date.